UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JOSEPH M. BENNETT,<br>DOMENIC D'AMBRA, JR.,<br>GREGORY L. HORTON, and<br>MARGARET MARY MCCORMICK,<br>individually and on behalf of all<br>other persons similarly situated,<br>　　　　Plaintiffs,<br><br>　v.<br><br>RALPH MOLLIS, in his official capacity<br>as Secretary of State for the State<br>of Rhode Island, JOHN A. DALUZ,<br>FRANK J. REGO, FLORENCE G. GORMLEY,<br>RICHARD H. PIERCE, and<br>MARTIN E. JOYCE, JR.,<br>in their capacity as Commissioners<br>of the Rhode Island Board of Elections<br>ROBERT KANDO, in his official<br>capacity as Executive Director of the<br>Rhode Island Board of Elections,<br>PASQUALE A. MATTEO, ANN H. ALLEN,<br>and ROSEMARY THOMAS, in their capacity<br>as Members of the Smithfield<br>Board of Canvassers,<br>　　　　Defendants,<br><br>and MAXINE CAVANAGH,<br>individually,<br>　　　　Intervenor. | C.A. No.　08-468 S |

## OPINION AND ORDER

William E. Smith, United States District Judge.

　Pending before the Court is Plaintiffs' Motion for Preliminary Injunction.  Also, before the Court is a Motion to Dismiss filed by the Rhode Island Board of Elections.[1]  Plaintiffs seek to enjoin

---

　[1] For reasons discussed below, the Court will reserve ruling on this motion at this time.

the Board of Elections and the Board of Canvassers for the Town of Smithfield, Rhode Island from issuing certificates of election to the prevailing candidates in the November 4, 2008 election for Smithfield Town Council.   Plaintiffs, who also seek class certification, are voters from the Town of Smithfield who claim that their civil rights were infringed in violation of 42 U.S.C. § 1983 as a result of having voted using ballots that included the name of a candidate who had withdrawn from the race.

Plaintiffs' amended complaint, filed approximately three weeks after the election,[2] contains a total of five counts; however, only two causes of action are actually asserted.[3]   Count II claims a violation of Plaintiffs' right to substantive due process alleging it was fundamentally unfair for Plaintiffs to have received and voted using an incorrect ballot, part of which was not counted. Count III asserts a violation of the right to equal protection premised on the theory that the Plaintiffs were victims of

---

[2] The Board of Elections argues that the equitable doctrine of laches bars this action because Plaintiffs waited three weeks after the election to file.   The Court disagrees and believes two weeks to realize that a claim exists and find a lawyer, plus another week for that lawyer to prepare a case is not unreasonable; moreover, the Court perceives no prejudice.   See In re Bankvest Capital Corp., 375 F.3d 51, 61 (1st Cir. 2004) (stating laches applies when a Court determines (1) plaintiffs' delay in bringing suit was unreasonable and (2) the delay has prejudiced the defendant).

[3] The remaing counts represent Plaintiffs' requests for class certification and injunctive relief against the Board of Elections and the Smithfield Board of Canvassers.   See Fed. R. Civ. P. 23(a) & 65(a).

discrimination because they were among those voters who received the incorrect ballots.

Plaintiffs originally filed this action the day before Thanksgiving. The Court granted Plaintiffs' request for a temporary restraining order preventing the Smithfield Board of Canvassers from certifying the election results to preserve the status quo and scheduled a preliminary injunction hearing for December 3, 2008. Subsequently, the Rhode Island Supreme Court issued a stay in a companion case involving a challenge filed by one of the losing candidates.[4]

After conducting a preliminary injunction hearing, this Court finds that Plaintiffs have failed to demonstrate a substantial likelihood of success on the merits of their case. Accordingly, Plaintiffs' request for a preliminary injunction must be denied.

I.   Findings of Fact

The Court finds the following facts from the stipulations of the parties and the evidentiary hearing conducted on December 3. On election day November 4, 2008, about 9,500 voters in the Town of Smithfield, Rhode Island participated in what was undoubtably our nation's most historic election. In addition to casting their vote for President of the United States, qualified voters were also electing new members to the Smithfield Town Council. The Town

---

[4] See Hawkins v. R.I. Bd. of Elections, No. 2008-318-M.P. (R.I. Dec. 4, 2008) (order granting motion to stay).

Council for the Town of Smithfield is comprised of five members, all of whom were up for re-election. The field of thirteen candidates consisted of four Democrats, five Republicans, and four Independents. Voters were allowed to vote for a maximum of five candidates and the top five vote-getters would then make up the new governing body. Unfortunately, the conduct of the election was far from flawless.

During the morning hours of the election, from about 7 a.m. to 10 a.m., at polling locations throughout the Town approximately 2,900 voters were given ballots that contained the name of Richard A. DiIorio, Jr. ("Mr. DiIorio"), a candidate who had withdrawn from consideration well before the election. Voters who cast a vote for Mr. DiIorio on the incorrect ballot did not have that one vote counted. All other votes contained on the incorrect ballot were considered in determining the outcome of the election.

After the votes were counted (and recounted), only a 39 vote differential separated the fifth place candidate, Ms. Maxine Cavanagh ("Ms. Cavanagh") a Republican, and the sixth place candidate, Mr. Bernard Hawkins ("Mr. Hawkins") a Democrat. The election of Ms. Cavanagh would result in a change of majority control of the Town Council from Democrat to Republican.

At the evidentiary hearing, the Director of the Elections Division for the Rhode Island Secretary of State, Ms. Janet L. Ruggiero ("Ms. Ruggiero"), testified that the mistake occurred

4

because an employee at the company hired to print the ballots had inadvertently used the wrong digital file to print the official ballots. Ms. Ruggiero explained that the Secretary of State had initially approved an electronic ballot template containing Mr. DiIorio's name on September 22, 2008. The Secretary of State then forwarded the September 22 template to the printing company responsible for printing the ballots. Eight days later, however, the Elections Division received a certificate of withdrawal from Mr. DiIorio directing that his name be taken off the ballot. The very next day, October 1, 2008, the Elections Division contacted the printer to remove Mr. DiIorio's name from the ballot. As requested, the printer made the change, which was reflected in the fact that both the mail ballots and the sample ballots (which were printed from the correct files) did not contain Mr. DiIorio's name; however, when it came time to print the official ballots in mid-to-late October, the employee in charge of printing those ballots failed to use the updated version saved on the company's computer network system. Instead, he relied on the outdated ballot that he had previously saved to his workstation hard drive and had not updated. Ballots were then printed using the wrong file and sent to the various polling locations. Election officials did not notice the mistake until the morning of election day.

To the credit of the Secretary of State, after being notified of the mistake around 8 a.m., his office immediately procured

corrected ballots from the printer and distributed them to Smithfield polling locations by 10 a.m.  The damage, however, had already been done.  During the three hour period before corrected ballots could be issued, approximately 2,900 people voted using the wrong ballot, 570 of whom cast a vote for Mr. DiIorio.

At the conclusion of the hearing, Plaintiffs and the Intervenor, Ms. Cavanagh,[5] submitted a Joint Statement of Facts.[6] For purposes of this decision, the Court will assume, as Plaintiffs contend, that 570 people actually voted for Mr. DiIorio using the incorrect ballot.  And, of those 570 ballots, the Court finds (again relying on Plaintiffs' assertion) that 458 contain a vote for Mr. Hawkins.  Thus, from this evidence, the Court deduces that Mr. Hawkins could have garnered additional support from only 112 of the 570 ballots.[7]

The Joint Statement of Facts also indicates there were 11 under-votes and 11 over-votes (9 of which contained a Hawkins

---

[5] Without objection, the Court approved Ms. Cavanagh's motion to intervene in this action at a status hearing held on December 1, 2008.

[6] The Court notes that despite the title there is very little agreement contained in the document.  Nonetheless, the Court will seek to give Plaintiffs the benefit of the doubt and will primarily rely on their figures.

[7] The Court assumes that the approximately 2,300 other voters who received the incorrect ballot and did not cast a vote for Mr. DiIorio were not influenced at all by his presence and thus would not have changed their vote using a correct ballot.

vote).[8]  Thus, these 11 under-votes must be subtracted from the 112 potentially outcome altering ballots because those voters exercised their right not to vote for a full slate of candidates and were not forced to choose between Mr. DiIorio and other candidates.  It is well known that voters sometimes choose to "maximize" their vote by voting for fewer than the allowable number of candidates and not for the maximum allowed.  No evidence was presented to suggest that voters who under-voted were doing anything other than maximizing their vote; to count these votes as potential Hawkins votes would be contrary to common sense and the evidence.[9]  Additionally, the 2 over-votes that did not contain a Hawkins vote must also be subtracted because it seems clear those voters made the conscience choice not to vote for Mr. Hawkins.  Thus, the Court concludes that the number of votes that potentially could have affected the outcome of the election between the fifth and sixth place finishers is 99.  It is on these facts that the ensuing analysis is based.

---

[8] The statement defines under-vote as a ballot where the voter cast a vote for less than the five candidates and over-vote as a ballot where the voter cast a vote for more than the five candidates.

[9] See e.g. Harmon v. Baldwin, 837 N.E.2d 1196, 1201 (Ohio 2005) (stating a voter's intent in an under-vote could reasonably be determined as being an intent not to vote).

7

II.  <u>Discussion</u>

The standard for obtaining preliminarily relief is familiar. In order to obtain a preliminary injunction, a Plaintiff must demonstrate: (1) a significant risk of irreparable harm absent the injunction; (2) a substantial likelihood of success on the merits of their claim; (3) the scales balancing the hardship tip in their favor; and (4) the injunction will not harm the public interest. <u>Wine & Spirits Retailers, Inc. v. Rhode Island</u>, 418 F.3d 36, 46 (1st Cir. 2005); <u>see also</u> <u>New Comm Wireless Servs., Inc. v. SprintCom, Inc.</u>, 287 F.3d 1, 9 (1st Cir. 2002) ("[t]he sine qua non of this four-part inquiry is likelihood of success on the merits"); <u>Mass. Coalition of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness of Commonwealth of Mass.</u>, 649 F.2d 71, 76 n.7 (1st Cir. 1981) (stating that a preliminary injunction should be used sparingly).  Moreover, in matters involving state and local election disputes, federal courts must tread lightly and strive to avoid becoming involved in matters that are more appropriately the ken of local election officials and state courts.

A.   Due Process

The right to vote is a bedrock principle of our democracy. <u>See</u> <u>Reynolds v. Sims</u>, 377 U.S. 533, 554 (1964); <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 370 (1886).  Interference with the right to vote can in some circumstances raise constitutional claims where voters are

8

disenfranchised or where the vote is sufficiently diluted. <u>Griffin</u> <u>v. Burns</u>, 570 F.2d 1065, 1077 (1st Cir. 1978); <u>see</u> <u>also</u> <u>Rossello-Gonzalez v. Calderon-Serra</u>, 398 F.3d 1, 16 n.29 (1st Cir. 2004) (citing <u>Bush v. Gore</u>, 531 U.S. 98 (2000)).   However, "[d]espite this bedrock federal interest, a federal court may not inject itself into the midst of every local electoral dispute." <u>Bonas v.</u> <u>Town of N. Smithfield</u>, 265 F.3d 69, 74 (1st Cir. 2001).   "The federal court is not equipped nor empowered to supervise the administration of a local election.  If every election irregularity or contested vote involved a federal violation, the court would 'be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law.'"   <u>Griffin</u>, 570 F.2d at 1077 (quoting <u>Powell v. Power</u>, 436 F.2d 84, 86 (2d Cir. 1970)).[10]

---

[10] With these principles of nonintervention in mind, the Court has given careful consideration to the Board of Elections' request that the Court abstain.   However, the Court declines this invitation at this stage and notes the decision to abstain is highly discretionary.  <u>See</u> <u>Duncan v. Poythress</u>, 657 F.2d 691, 696 (5th Cir. Unit B 1981) (stating the extraordinary nature of abstention stems from the duty of decision imposed upon the district courts by Congress).  It is insufficient to justify a decision to abstain because a case concerns a state electoral process.  <u>See</u> <u>Smith v. Cherry</u>, 489 F.2d 1098, 1101 (7th Cir. 1973). Although the First Circuit has recognized abstention is plausible in state election cases, <u>see</u> <u>Bonas v. Town of N. Smithfield</u>, 265 F.3d 69, 76 n.5 (1st Cir. 2001) this Court believes the constitutional nature of Plaintiffs' claims compel the exercise of jurisdiction, at least to resolve this request for preliminary

Before an election error becomes a key that unlocks the restraints on the federal court's authority to act, the Plaintiffs must demonstrate either an intentional election fraud or an unintentional error resulting in broad-gauge unfairness. Griffin, 570 F.2d at 1077; see also Navedo v. Acevedo, 752 F. Supp. 523, 528-530 (D.P.R. 1990), aff'd, 932 F.2d 94 (1st Cir. 1991).

Here, Plaintiffs concede, as they must, there are no suggestions of intentional fraud. Instead, Plaintiffs proceed on the theory that the unintentional injection of incorrect ballots into the election process created a patent and fundamental unfairness. Plaintiffs must clear a high bar to prevail on this theory, however, because the First Circuit has held that save for a "total and complete disenfranchisement of the electorate as a whole" garden variety election errors do not typically harbinger patent and fundamental unfairness. Bonas, 265 F.3d at 75.

The First Circuit's leading cases in this area suggest several factors for the Court to consider in assessing whether an election error rises to the level of fundamental unfairness. See Rossello-Gonzalez, 398 F.3d at 14; Bonas, 265 F.3d at 73; Partido Nuevo Progresista v. Barreto Perez, 639 F.2d 825, 827 (1st Cir. 1980); Griffin, 570 F.2d at 1077. These include but are not limited to:

_____

relief. If this case proceeds beyond this stage, the Court may reconsider the abstention question.

the breadth of the unfairness,[11] whether the unfairness played a role in determining the outcome, whether the error induced any detrimental reliance of the part of the voters, and whether there is an adequate state administrative and judicial corrective process.[12]

Plaintiffs' complaint appears to sound in detrimental reliance: that voters were induced by the incorrect ballot to vote for Mr. DiIorio.  To convince the Court of this claim, Plaintiffs only offered their self serving affidavits.  They presented no evidence as to whether any voters actually relied on the presence of Mr. DiIorio to the exclusion of Mr. Hawkins or anyone else; nor was evidence presented as to whether election officials took steps to inform morning voters they were receiving an incorrect ballot. However, even if the Court were to assume voters relied to their detriment on the ballot, Plaintiffs have totally failed to show that this fact somehow could have made a difference in the outcome.

---

[11] The breath of the unfairness here is plain based on the number of incorrect ballots utilized (2,900) out of the total cast (9,500).  These numbers, however, only tell a small part of the story as the discussion below reveals.

[12] Although not germane to the constitutional analysis, the Court notes the similarity of these factors to the standard outlined in the leading Rhode Island Supreme Court election case. See Buonanno v. DiStefano, 430 A.2d 765 (R.I. 1981).  In that case, the Rhode Island Supreme Court clearly expressed that there is a strong public policy favoring stability and finality of election results and that an election should not be upset absent a compelling reason. Id. at 770.  A mere mathematical possibility, as opposed to solid probability, that an error affected the results is insufficient to disturb an outcome. Id.

When reviewing evidence of election results, it is important to keep in mind that "mathematical certainty" is not required, and instead Plaintiffs may show that the irregularity could have altered the outcome. <u>Griffin</u>, 570 F.2d at 1080.  At the close of the hearing, the Court requested, and the parties subsequently submitted, the complete Town Council election results on a precinct basis for both sets of ballots (those that contained Mr. DiIorio's name and those that did not).  The Court also requested a recount report for Ms. Cavanagh and Mr. Hawkins generated by the Board of Elections that includes the final totals for ballots cast with and without Mr. DiIorio's name.  At the hearing, Plaintiffs presented no expert to assist the Court in analyzing this evidence for outcome determinativeness.  Rather, Plaintiffs relied on their bald assertions that because the number of ballots containing a vote for Mr. DiIorio but not a vote for Mr. Hawkins is greater than the margin separating the fifth and sixth place finisher, the outcome could have been affected.  However, this argument, like most easy solutions, is "neat, plausible, and wrong."[13]

In determining whether Mr. Hawkins could have secured victory from the 99 voters the Court earlier deduced could have made difference one thing is clear: for Mr. Hawkins to have overcome the 39 vote advantage held by Ms Cavanagh, he would have to receive

---

[13] <u>See</u> H.L. Mencken, <u>The Divine Afflatus</u>, in <u>A Mencken Chrestomathy</u>, chapter 25, p. 443 (1949) ("There is always an easy solution to every human problem—neat, plausible, and wrong.").

over 40 percent of those 99 votes.  However, based Mr. Hawkins's performance on the corrected ballot, it seems nearly certain that he has virtually no chance of conquering this deficit.

In accordance with a district court's inherent authority to appoint technical advisors, see Reilly v. United States, 863 F.2d 149, 155 (1st Cir. 1988); see also Ex parte Peterson, 253 U.S. 300, 312-13 (1920), the Court contacted Jennifer L. Lawless, Ph.D., Associate Professor of Political Science at Brown University, to assist the Court with analyzing the election data that the Court requested.  Professor Lawless is a nationally renowned scholar and a leading authority in the field quantitative analysis of election data.[14]  At best, the calculations Professor Lawless ran suggest Mr. Hawkins would have received 12 percent of the 99 ballots, leaving him far short of overcoming Ms. Cavanagh's lead.  Her computations of the election data suggest a "compelling statistical improbability" that Mr. DiIorio's name being on the ballot cost Mr. Hawkins the election.  The Court concludes, as Professor Lawless advises, that:

---

[14] The Court notes that it asked Professor Lawless to advise in this case because she possesses the specialized skill of applying statistical analysis to election data.  While the Court could have undertaken this type of analysis own its own, the prudent approach was to do so guided by the hand of a neutral and detached academic.  The Court greatly appreciates the willingness of Professor Lawless to assist in this case on short notice and without compensation.  Attached as an appendix to this decision is the report prepared by Professor Lawless that aided the Court's review of the evidence.

> Considering that the aggregate and precinct-level analysis demonstrates that Mr. Hawkins did not fare considerably worse in the places we might expect when Mr. DiIorio's name appeared on the ballot, coupled with the fact that the data imputation in the most plausible scenario does not alter the outcome of the election, it seems highly unlikely that even more precise estimates would predict a 5th place finish for Mr. Hawkins.

While Professor Lawless's report does leave room for the remote possibility that a more in-depth analysis might reveal a different conclusion, the Court concludes based on the mathematical calculations she performed that it is not probable.[15]

The Court need go no further. Plaintiffs have not met their burden of showing a likelihood of success on the merits of their due process claim and to probe the remaining factors would be pointless. See New Comm Wireless, 287 F.3d at 9 ("if the moving

---

[15] Professor Lawless performed a total of six statistical analyses on the election data evidence. And, in only one analysis was she able to produce a result different from election day with Mr. Hawkins coming in fifth. See Table 2 of Appendix I. However, the Court agrees with Professor Lawless that this scenario was unlikely to have occurred and is reminded you can "torture numbers, and they will confess to anything." Gregg Easterbrook, Our Warming World, New Republic, 11 November 1999, Vol. 221, 42.

Furthermore, Professor Lawless's report also assists in debunking Plaintiffs' related contention that another candidate, in addition to Mr. Hawkins, was harmed by the incorrect ballot. At the hearing, Plaintiffs suggested Richard A. Poirier ("Mr. Poirier") may have been able to prevail but for the erroneous ballot. However, it appears that Mr. Poirier would have actually faired worse not better if the correct ballot had been in use for the entire election. It is also inconceivable to believe that Mr. Poirier would have received over 50 percent of the 536 votes Plaintiffs claim altered the outcome of Mr. Poirier's race given that no candidate received more than 12 percent of the vote.

party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity").[16]

### B.   Equal Protection

Plaintiffs' argument that their likelihood of success is stronger on their equal protection claim fares no better.   While Plaintiffs may have been discriminated against on election day, the Supreme Court has made clear that "the Equal Protection Clause does not make every minor difference in the application of laws to different groups a violation of our Constitution." Williams v. Rhodes, 393 U.S. 23, 30 (1968).   If Plaintiffs fell into a "discrete monitory" once election officials made the decision to switch out the erroneous ballots with the corrected ones, see Bonas, 265 F.3d at 74, this was not because of some arbitrary treatment designed to discriminate. See Bush v. Gore, 531 U.S. 98, 104 (2000); see also Torres-Rivera v. Calderon-Serra, 412 F.3d 205, 211 n.7 (1st Cir. 2005) (stating that under the equal protection clause of the Fourteenth Amendment a showing of disproportionate impact alone is not enough to establish a constitutional violation; plaintiff still must show purposeful discrimination).   Rather,

---

[16] With regard to the adequacy of the state process, the Board of Elections took the position that Plaintiffs should have filed their complaint as part of the challenge filed by Mr. Hawkins. However, when pressed the Board pointed to no authority other than general language in the Board's enabling legislation that supports the contention that affected voters have standing to pursue such matters in front of the Board of Elections. See R.I. Gen. Laws § 17-7-5(a)(1),(11).  This Court need not resolve that question here.

election officials decided to advance the legitimate and valid goal
of preservation of the integrity of the electoral process. <u>Rosario
v. Rockefeller</u>, 410 U.S. 752, 761 (1973).    Moreover, the First
Circuit has refused to find violations of equal protection in
situations where the rationale for the decision to discriminate is
based on avoiding voter confusion and assuring that the winner is
the choice of a majority, or at least a large plurality, of those
voting. <u>See Hopfmann v. Connolly</u>, 769 F.2d 24, 25 (1st Cir. 1985)
(quoting <u>Storer v. Brown</u>, 415 U.S. 724, 732 (1974)).   Thus, the
Plaintiffs' equal protection claim is not stronger, and in fact may
even be weaker on the merits than their due process claim. Given
the analysis above, Plaintiffs have failed again to present
evidence sufficient to meet their burden of likelihood of success
on the merits.

III. <u>Conclusion</u>

Based on the foregoing, Plaintiffs' Motion for Preliminarily
Injunctive Relief is DENIED.

The Defendant Rhode Island Board of Elections' Motion to
Dismiss is DENIED in part (laches); the Court reserves ruling on
Defendants' other motions.

IT IS SO ORDERED.

_____

William E. Smith
United States District Judge
Date: 12/10/08

16